**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| BRIAN REIDER, SHULAMIS ROUZAUD, TIMOTHY BLUE, DAVID BREWER, and MICHAEL COLLINS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOVCIO, LLC, PREMIUM PARKING SERVICE, LLC, MUNICIPAL PARKING SERVICES, INC., and LOB, INC.,<br><br>Defendants. | Case No.: 1:26-CV-2207<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Brian Reider, Shulamis Rouzaud, Timothy Blue, David Brewer, and Michael Collins ("Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated against Defendants Premium Parking Service, LLC ("Premium"), Municipal Parking Services, Inc. ("MPS"), GovCIO, LLC ("GovCIO"), and LOB, Inc. ("LOB") (collectively, "Defendants"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a privacy infringement class action lawsuit against each Defendant for knowingly obtaining, using, and/or disclosing the statutorily protected personal information of Plaintiffs and the proposed Class—specifically, names and addresses derived from state departments of motor vehicles ("DMV") records—in violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.*

2. The Driver's Privacy Protection Act ("DPPA") provides that any organization or entity "who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains[.]" 18 U.S.C. § 2724(a).

3. Unbeknownst to Plaintiffs and Class Members, Defendants Premium and MPS surreptitiously use "license plate recognition" ("LPR") technology, capturing and reading vehicle license plates at Defendant Premium's parking facilities, so that Defendant GovCIO can then illegally obtain Plaintiffs and Class Members' statutorily protected information from state DMV records.

4. Once GovCIO obtains the Plaintiffs and Class Members' DPPA-protected personal information, Defendants GovCIO, MPS, Premium, and LOB, then illegally obtain and use and disclose that statutorily protected information to send letters (entitled "Parking Tickets/Invoices" and "Late Notices") to Plaintiffs' and Class Members' home addresses, demanding sums that are 1,000%+ above the initial parking cost.

5. What is more, the parking tickets and late notices sent by Defendant LOB on behalf of Defendants GovCIO, Premium, and MPS threaten to boot and/or tow vehicles or send these purported bills to collection agencies if individuals do not immediately pay the exorbitant fines and fees.

6. In so doing, Defendants each willfully and recklessly disregarded the privacy protections afforded by the DPPA to harass, threaten, and intimidate Plaintiffs and Class Members into paying inflated amounts of money for trivial, alleged parking violations.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 because it arises under a law of the United States (*i.e.*, the DPPA). This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Class, and there is minimal diversity.

8. This Court has personal jurisdiction over each Defendant because the events giving rise to Plaintiff Reider's claims and the claims of other Class Members in Maryland occurred as a result of each Defendant's purposely directed contacts with Maryland and its residents. Defendants obtained Plaintiff Reider's DPPA-protected records from Maryland's Motor Vehicle Administration and used those records to mail invoices to Plaintiff Reider's home in Maryland that were related to alleged parking violations that occurred at a parking lot in Baltimore, Maryland.

9. Specifically, this Court has personal jurisdiction over MPS because MPS conducts business in Maryland, is registered to do business in Maryland, and directed the conduct at issue in this action towards a Plaintiff in this District. MPS captured the license plate information of Maryland drivers' at multiple locations in Maryland, attempted to enforce an alleged private parking charge arising from a parking facility in Baltimore, Maryland; obtained or caused the obtainment of Maryland drivers' protected personal information from the Maryland Motor Vehicle Authority's records, including Plaintiff Reider's information; and, mailed or caused private parking notices to be mailed to Maryland residents, including to Plaintiff Reider at his home address in Bel Air, Maryland.

10. Specifically, this Court has personal jurisdiction over Premium because Premium conducts business in Maryland, is registered to do business in Maryland, and directed the conduct at issue in this action towards a Plaintiff in this District. Premium managed multiple parking lots and decks in Maryland, attempted to enforce an alleged private parking charge against Maryland

residents arising from parking facilities in Maryland; obtained or caused the obtainment of Maryland drivers' protected personal information from the Maryland Motor Vehicle Authority's records, including Plaintiff Reider's information; and, mailed or caused private parking notices to be mailed to Maryland residents, including to Plaintiff Reider at his home address in Bel Air, Maryland.

11. Specifically, this Court has personal jurisdiction over GovCIO because GovCIO is registered to do business in Maryland, conducts extensive business in Maryland, and GovCIO provides parking enforcement services to private parking operators at facilities located in Maryland, including facilities operated or enforced by Premium and MPS. GovCIO obtained Maryland drivers' protected personal information from the Maryland Motor Vehicle Authority's records, including Plaintiff Reider's information, by using license plate information captured in Maryland; and, mailed or caused private parking notices to be mailed to Maryland residents, including to Plaintiff Reider at his home address in Bel Air, Maryland.

12. Specifically, this Court has personal jurisdiction over LOB because LOB conducts business in Maryland and directed the conduct at issue in this action towards a Plaintiff in this District. LOB used the personal information of Maryland drivers' that came from the Maryland Motor Vehicle Authority's records, including Plaintiff Reider's information, to mail private parking notices to Maryland residents, including to Plaintiff Reider at his home address in Bel Air, Maryland.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of these events giving rise to Plaintiff Reider's claims occurred in this judicial district. The parking facility at issue in Plaintiff Reider's claims is located in Baltimore, Maryland. Plaintiff Reider resides in Bel Air, Maryland. Defendants used or disclosed Plaintiff Reider's personal

information they obtained from the Maryland Motor Vehicle Authority records to identify him and mail parking notices to his home address in this District.

## PARTIES

### *Plaintiffs*

14. Plaintiff Reider is a natural person over the age of eighteen and a citizen of Maryland, residing in Harford County, Maryland, where he intends to remain.

15. Plaintiff Shulamis Rouzaud is a natural person over the age of eighteen and a citizen of Illinois, residing in Lake County, Illinois, where she intends to remain.

16. Plaintiff Timothy Blue is a natural person over the age of eighteen and a citizen of Arkansas, residing in Pulaski County, Arkansas, where he intends to remain.

17. Plaintiff David Brewer is a natural person over the age of eighteen and a citizen of Mississippi, residing in Warren County, Mississippi, where he intends to remain.

18. Plaintiff Michael Collins is a natural person over the age of eighteen and a citizen of Alabama, residing in Lee County, Alabama, where he intends to remain.

19. As described in more detail *infra*, Plaintiffs are all victims of Defendants' scheme. Defendants unlawfully identified Plaintiffs by obtaining their protected personal information from state motor vehicle records without their express consent in order to surprise, harass, threaten, and intimidate them.

### *Defendants*

20. Defendant Premium Parking Service, LLC ("Premium") is a limited liability company organized under the laws of Delaware with its principal place of business at 601 Poydras Street, Suite 1500, New Orleans, Louisiana 70130. Upon information and belief, each of the members of Premium Parking Service, LLC are citizens of Louisiana.

21. Defendant Municipal Parking Services, Inc. ("MPS") is a corporation organized under the laws of Minnesota with its principal place of business at 11305 Four Points Drive, Building 2, Suite 300, Austin, Texas 78726.

22. Defendant GovCIO, LLC ("GovCIO") is a limited liability company organized under the laws of Delaware with its principal place of business at 4000 Legato Road, Suite 600, Fairfax, Virginia 22033. Upon information and belief, each of the members of GovCIO, LLC are citizens of Virginia.

23. Defendant LOB, Inc. ("LOB") is a Delaware corporation with its principal place of business located at 2261 Market Street, Suite 5668, San Francisco, California 94114.

24. Wherever reference in this Complaint is made to any act or transaction of any Defendant, such allocations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of each committed, knew of performed, authorized, ratified and/or directed such act or transaction on behalf of that Defendant while actively engaged in the scope of their duties.

## FACTUAL ALLEGATIONS

### A. Overview of Defendants' Scheme

25. Defendant Premium is a parking management operator and parking-related technology company, often hired by owners of private parking lots and decks around the country, to manage parking and enforce payment. This case arises from Premium's desire to automate the enforcement of payment at the properties it manages and eliminate the costs of traditional gates or attendants. Premium contracts with Defendant MPS to make this happen.

26. MPS is a business that provides "automated parking enforcement" and collection services to owners and/or operators of parking lots and decks nationwide. MPS's technology and systems allow its customers, like Premium, to manage and enforce their parking lots and decks

(many of which are gateless and operate without a parking attendant) around the clock. Its technology includes cameras that leverage LPR technology.

27. MPS's LPR technology allows its customers to identify alleged violators by only their license plates. MPS and Premium then mail "Parking Invoices" or "Late Notices" (through LOB) to alleged violators demanding payment for expired or unauthorized parking in addition to a "ticket amount" that greatly exceeds the unpaid parking amount.

28. The "Parking Invoice" or "Late Notice" threatens alleged violators that they must pay MPS and Premium before a certain date to avoid additional unidentified penalties (the "ticket amount"), thereby making the total amount due in some instances ***five to eleven times*** the amount of unpaid parking. The "Invoice" further threatens consumers that "TICKETS NOT PAID AFTER 60 DAYS WILL BE REFERRED TO COLLECTIONS. VIOLATOR'S VEHICLES ARE SUBJECT TO BOOTING/TOWING."

29. Essentially, MPS's system is intended to automate parking lots by capturing the license plate information of every vehicle that enters and exits a lot. The system is designed to track how long vehicles stay in the parking lot and whether the driver of the vehicle paid for parking.

30. In reality, MPS created systems that are intentionally designed to confuse, deceive, and charge unauthorized fines and fees to extract more revenue from consumers in addition to any alleged unpaid parking. The purpose of MPS's automated enforcement system is simple: decrease overhead and increase profits for MPS and its clients, but to do so it must violate each individual's DPPA-protected right to privacy.

31. The parking facilities operated by MPS have no entrance gates, physical barriers, or attendants that would indicate that the lot is private and monitored by cameras. Instead, signage

is posted sporadically around the edges of the lots. There are no barriers, kiosks, or attendants to require payment at the exits, either.

32. Unsurprisingly, many drivers are accustomed to lots and decks that have gates or attendants and simply do not realize that the parking lots are paid lots being managed and monitored by MPS and Premium.

33. If a driver misses the posted signs regarding payment, is unsure how or where to pay, or leaves the unattended and ungated parking lot without paying for some other reason, MPS captures the vehicle's license plate information with its LPR technology.

34. MPS then sends that license plate information to Defendant GovCIO, who MPS and Premium contract with, to obtain the vehicle owner's protected personal information from records originating from state DMVs.

35. In other words, Premium and MPS utilize MPS's LPR technology to capture the license plates of each vehicle that enters the lots managed by Premium. GovCIO, on behalf of MPS and Premium, then knowingly and unlawfully obtain individuals' vehicle registration information from records originating from the DMV to attempt to extort exorbitant sums of money as payment for an alleged parking violation.

36. Premium, MPS, and GovCIO obtained—and continue to obtain—statutorily protected personal information, including the names and addresses of Plaintiffs and Class Members, from non-public motor vehicle records originating from the DMVs, in clear violation of the DPPA.

37. On behalf of Premium and MPS, GovCIO obtained the names and addresses of Plaintiffs and Class Members by submitting "license plate look up requests" to certain data brokers that "stockpile" current state DMV records.

38. In response, the data brokers then perform a "DMV Lookup" search of their databases—which consists of up-to-date records compiled from state DMV vehicle registration databases—to match the license plate with the current vehicle owner's names and address.[1]

39. If the DMV Lookup is successful—as was the case for the Plaintiffs and Class Members—the data brokers then disclose the name and address of the current vehicle owner to GovCIO, MPS, and Premium, in violation of the DPPA.

40. GovCIO, on behalf of Premium and MPS, then illegally discloses the statutorily-protected personal information of Plaintiffs and Class Members to Defendant LOB, a third-party mailing service.

41. LOB then illegally uses the protected personal information to mail Plaintiffs and Class Members surprise invoices they never agreed to pay—***doubling, tripling, and even quadrupling*** the arbitrary charges within weeks of the initial demand and ***threatening to send the bills to collection agencies or to boot or tow the vehicles if not paid immediately***.

42. For example, as discussed in more detail *infra*, Plaintiff Reider received a letter in the mail from MPS and Premium relating to a parking fee his daughter allegedly incurred while driving his vehicle—he's never even been to the Premium lot himself. Plaintiff Rouzaud has received three (3) letters from MPS and Premium—the first stating her ticket amount was $105 and the second stating she owed $145—after she paid another parking management company for the parking. Plaintiff Brewer has received three (3) letters from MPS and Premium—the first stating his ticket amount was $115 and the second stating he owed $155—even though he has never parked in one of their lots. Plaintiff Blue has received two (2) letters in the mail from MPS

[1] As was the case with Plaintiffs Reider and Blue, Defendants have no way of knowing whether the driver of the vehicle that allegedly failed to pay to park is even the registered owner of the vehicle that entered the parking lot, making their DPPA violations even more egregious.

and Premium relating to an unpaid parking fee his daughter incurred while driving his vehicle—again, he did not park in the Premium lot himself. Plaintiff Collins received a ticket for $85 after parking in a Premium lot, which he believed was city parking, that had signs stating that fees were not being collected at that time.

### B. History and Background of the DPPA

43. In 1994, Congress enacted the DPPA to protect the privacy and safety of licensed drivers and to limit misuse of the private personal information contained in DMV record systems. The DPPA imposes strict rules for collecting personal information from driver records and provides for liability in cases where an entity improperly collects, discloses, uses, or sells such records. *See generally* 18 U.S.C. § 2721, *et seq*.

44. The DPPA safeguards drivers' private personal information from disclosure by state DMVs or acquisition by a third party for any purpose other than the limited permissible purposes expressly delineated in the DPPA.

45. In creating special protections for private data in this context, the DPPA responded to concerns over the personal information captured and retained by state motor vehicle records. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records; "[u]nlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records. *See* 140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); *ibid.* (statement of Rep. Moran).

46. Personal information protected by the DPPA "means ***information that identifies an individual***," which may "includ[e] an individual's photograph, social security number, driver identification number, ***name, address*** (but not the 5-digit zip code), telephone number, and medical

or disability information," that is obtained "in connection with a motor vehicle record." 18 U.S.C. § 2725(3) (emphasis added); 18 U.S.C. § 2721(a)(1).

47. "Motor vehicle record" is defined to include "any record that pertains to a motor vehicle operator's permit, ***motor vehicle title, motor vehicle registration***, or identification card issued by a department of motor vehicles[.]" 18 U.S.C. § 2725(1) (emphasis added).

48. Pursuant to 18 U.S.C. § 2724, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains."

49. The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information. Those 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran).

50. Notably, the DPPA does not list or identify any specific prohibited uses; rather, it generally prohibits all uses except for the fourteen permissible uses enumerated in 18 U.S.C. §2721(b).

51. As detailed in this Complaint, none of the DPPA's permissible uses apply to Defendants' uses as alleged herein.

52. Indeed, 18 U.S.C. §§ 2721(a) and 2722(a) make nondisclosure of personal information the default rule. *See* 18 U.S.C. § 2721(a) ("[i]n [g]eneral" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information, … for any use not

permitted under section 2721(b) of this title.”). 18 U.S.C. §2721(b) then lists the fourteen (14) discrete exceptions to non-disclosure, exceptions that, again, do not and cannot apply here.

53. The DPPA creates a private right of action for “the individual” whose personal information was knowingly obtained, disclosed, or used “for a purpose not permitted” under 18 U.S.C. § 2721(b). *See* 18 U.S.C. § 2724(a); 18 U.S.C. § 2722(a) (“It shall be unlawful for any person knowingly to obtain or disclose personal information, … for any use not permitted under section 2721(b) of this title.”).

### C. Defendants Premium, MPS, GovCIO, and LOB Obtained, Used and Disclosed Protected Personal Information in Violation of the DPPA

54. MPS is a parking lot technology and enforcement company that uses its proprietary technology to automate parking enforcement and collect from supposed violators.

55. MPS touts on their website that “[t]he MPS parking enforcement technology platform is simple. We automate enforcement by providing enhancements to enforce, detect & collect. It’s flexible and customizable to meet our client’s ongoing needs while providing them with an economic model that works.”[2]

56. Premium—with whom MPS contracts as its enforcement and collections vendor—manages more than 1,000 parking lots and decks across the country.[3]

57. MPS licenses or sells its proprietary LPR technology and software to Premium, which allows Premium to monitor its parking lots via cameras and without any physical barriers or attendants.

58. For MPS and Premium to send “tickets,” “invoices,” “notices” or “citations” to the

---

[2] MPS, *Lots & Garages Automated LPR Cameras*, https://municipalparkingservices.com/solutions-lots-and-garages (last accessed Sept. 25, 2025).

[3] *See, e.g.*, PREMIUM PARKING, *The Intersection of Parking Management & Technology.*, https://solutions.premiumparking.com/about-us (“1400+ Locations” and “157K+ Spaces Managed”) (last accessed October 7, 2025).

alleged "violators"—none of whom had provided either company with their mailing address or written consent for MPS to obtain it—MPS collects the license plate information of drivers entering and exiting the lots.

59. MPS, pursuant to its contract with Premium, sends the license plate information to GovCIO, who submits a DMV-lookup search to the data brokers for those plate numbers within vehicle registration databases consisting of information originating from state DMV offices.

60. Premium and MPS do not shy away from the fact that they obtain and use vehicle registration information originating from DMV records to send out "notices" and "invoices."

61. According to its own website, "***MPS can also perform DMV look ups***[.]"

62. Although MPS removed this language from its website after a previous DPPA lawsuit was filed against it, a copy of the MPS web page being referenced was captured on July 9, 2024, and is attached hereto as **Exhibit A**.

63. Premium also explicitly represented that the automated ticketing process it uses relies on the use of DMV records. In a publicly-available marketing presentation on Premium's website, Premium explained: "***Using DMV-look up solutions***, you'll have easy access to violator addresses to send invoices by mail." (emphasis added). A copy is attached hereto as **Exhibit B**.

64. Once GovCIO illegally obtains the name and address information, GovCIO then illegally discloses that information—on behalf of Premium and MPS—to LOB, the mailing vendor, pursuant to GovCIO's contract with LOB.

65. LOB then illegally uses the DMV-lookup information to print and mail letters to Plaintiffs and Class Members, demanding payment to Premium and MPS.

66. Premium and MPS assist LOB with the design and make up on the letters, inputting their names and logos on them.

67. The letters that LOB sent to Plaintiffs and Class Members pursuant to its contract with Premium, MPS, and GovCIO instruct recipients to pay by check to MPS or online via Premium's website.

68. MPS and Premium each receive a share of the revenue derived from any payments received from alleged parking violators as a result of MPS's "enforcement" and collection services.

69. MPS pays GovCIO to obtain the DMV-lookup information from the data brokers and to handle the mailing of the parking invoices by LOB.

70. Upon information and belief, MPS's written agreements with GovCIO include numerous references to the DPPA and the need for strict compliance with DPPA requirements by both parties.

71. Upon information and belief, GovCIO's written agreements with LOB also include numerous references to the DPPA and the need for strict compliance with DPPA requirements by both parties.

72. Upon information and belief, when applying to West Publishing Company ("WPC") for access to its CLEAR database in 2021, GovCIO represented that it had permissible uses to obtain protected personal information. Namely, GovCIO represented that it was using this information (1) to verify or correct information provided by a person to prevent fraud, pursue legal remedies, recover a debt, skip tracing, or (2) for use in connection with a civil, criminal or arbitral legal proceeding, or legal research.

73. Upon information and belief, when applying to WPC for access to its CLEAR database in 2023, GovCIO instead represented that the protected personal information was being requested for official use by a court, law enforcement agency, or government agency.

74. GovCIO, Premium, MPS, and LOB each knew that these purported permissible uses asserted by GovCIO to WPC were false and misleading representations. Each Defendant was and is aware of the others' involvement.

75. None of these defendants complied with the DPPA. To accomplish their parking enforcement and collection scheme, Premium, MPS, GovCIO, and LOB obtained, disclosed, and used driver records without Plaintiffs' written consent and without a permissible purpose under the DPPA.

76. Defendants Premium, MPS, GovCIO, and LOB obtained, disclosed, and used the protected personal information of Plaintiffs and Class Members with full knowledge that they were doing so without a permissible use; therefore, their DPPA violations were committed willfully and/or with reckless disregard for the law.

### D. The Protected Information Obtained, Used, and Disclosed by Each Defendant Came from State DMV Records

77. State DMV offices sell or otherwise license access to their databases of personal information to "data brokers" like WPC, which operates a massive database of personal information named CLEAR.

78. Courts have routinely decided that the practice of data brokers obtaining DMV records in bulk or "stockpiling" DMV records to resell to users does not violate the DPPA.

79. However, if a data broker like WPC intends to resell or "redisclose" the DMV data, the data broker still has a duty to comply with the DPPA's requirements to only disclose the protected personal information to a buyer that has a permissible use for the information.

80. GovCIO had (and still has) written agreements stating that GovCIO will pay WPC to perform DMV Lookups in its CLEAR database for the names and addresses associated with the license plate numbers GovCIO provides.

81. GovCIO has similar contracts with other data brokers as well.

82. WPC's CLEAR database includes vehicle registration and vehicle title information obtained from state DMV records.

83. In public marketing material for its CLEAR product,[4] WPC confirms that its "current data includes" "***DMV records***—driver's license and vehicle and watercraft registrations" as well as "***live access***" to "***Motor vehicle registration data***." (emphasis added).

84. Other marketing material for CLEAR advertises that its data includes ***live DMV data***, including live address and phone data ***from current vehicle registrations***.

85. In response to GovCIO's requests, the data brokers obtained Plaintiffs' personal information from state DMV records and disclosed that information to GovCIO.

86. In its requests to WPC for Plaintiffs' personal information, GovCIO represented that it was going to use the protected personal information pursuant to 18 U.S.C. § 2721(b)(3), which permits the use of personal information to "verify the accuracy of personal information submitted by the individual to the business or its agents[.]"

87. But Plaintiffs and Class Members have never submitted their names and addresses to GovCIO, MPS, Premium, or LOB, and each Defendant was fully aware of this fact.

88. GovCIO did not have any permissible use for Plaintiffs' protected information that it requested from WPC, making WPC's disclosures to GovCIO violations of the DPPA.

89. Upon information and belief, when GovCIO applied to WPC for access to the CLEAR database in 2021, GovCIO explained that its purpose for accessing CLEAR was to append a name and address to an auto tag in violation of a parking violation, and that this information would result in a violation fine being sent to the violator by mail.

---

[4] Attached hereto as **Exhibit C**.

90. Each Defendant had full knowledge that their true purpose for obtaining the protected personal information did not fall under any of the fourteen permissible uses listed in the DPPA.

91. Yet, each Defendant still obtained, used, and/or disclosed the protected personal information of Plaintiffs and Class Members with full knowledge that they had no valid, permissible use for the information, meaning each Defendant's DPPA violations were committed willfully and/or with reckless disregard for the law.

**E. Defendants' Conduct Does Not Fall Under Any Permissible Purpose Under the DPPA**

92. Plaintiffs never provided their names or addresses to Defendants.

93. Plaintiffs never authorized Defendants to obtain their protected personal information from any motor vehicle record.

94. Defendants knowingly obtained and used Plaintiffs' personal information from records maintained by the DMV by cross referencing Plaintiffs' license plates with vehicle registration data that originated from and is maintained by the DMV. This occurred without Plaintiffs' express or written authorization or consent.

95. Defendants' obtainment, disclosure, and/or use of personal information from Plaintiffs' motor vehicle records was not for any enumerated purpose.

96. Defendants are not government agencies, and Defendants were not acting on behalf of any federal, state, or local agency in carrying out its functions when they obtained, disclosed, and used Plaintiffs' personal motor vehicle record information.

97. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of

motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities; or removal of non-owner records from the original owner records of motor vehicle manufacturers.

98. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information to verify the accuracy of personal information submitted by Plaintiffs to Defendants or Defendants' agents, employees, or contractors.

99. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, or the execution or enforcement of judgments and orders, or pursuant to an order of a federal, state, or local court.

100. Defendants did not intend to obtain, disclose, or use Plaintiffs' personal motor vehicle record information for potential use in future legal proceedings against Plaintiffs.

101. Defendant obtained, disclosed, and used Plaintiffs' personal motor vehicle record information solely to send demand letters for payment to Plaintiffs' homes.

102. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in research activities, or for use in producing statistical reports.

103. Defendants are not insurers, insurance support organizations, and were not acting in connection with claims investigation activities, antifraud activities, rating or underwriting when it obtained, disclosed, and/or used Plaintiffs' personal motor vehicle record information.

104. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in providing notice to Plaintiffs that their vehicles had been towed or impounded.

105. Defendants are not licensed private investigative agencies or licensed security

services.

106. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information to obtain or verify information relating to a holder of a commercial driver's license.

107. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in connection with the operation of private toll transportation facilities.

108. No state or motor vehicle department secured Plaintiffs' express consent or authorization to provide their personal motor vehicle record information to Defendants.

109. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for bulk distribution for surveys, or marketing or solicitations.

110. Defendants did not obtain Plaintiffs' express written consent or authorization to obtain, disclose, or use their personal motor vehicle record information.

111. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use related to the public's safety.

112. Defendants did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use related to the operation of Plaintiffs' motor vehicle. On the contrary, Defendants' obtainment, disclosure, and/or use Plaintiffs' personal motor vehicle record information was related to the parking (i.e., non-operation) of Plaintiffs' motor vehicle.

113. No state statute authorized Defendants to use license plate readers and to obtain, disclose, or use Plaintiffs' personal motor vehicle record information.

114. After illegally obtaining Plaintiffs' personal information, GovCIO, Premium, MPS, and LOB impermissibly used the information to send parking notices or tickets to Plaintiffs'.

115. Defendants knowingly obtained, disclosed, and/or used Plaintiffs' personal motor vehicle record information for a purpose not permitted under the DPPA.

116. Defendants' violations of the DPPA caused Plaintiffs and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, wasted time, emotional distress, nuisance, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiffs and the Class Members.

117. The misconduct by Defendants violated—and continues to violate—the DPPA and Defendants have harmed Plaintiffs and Class Members by (1) invading their privacy when obtaining their protected personal information from the DMV without their express consent and (2) by intruding upon their right to seclusion by sending letters and other communications threatening them with collection actions. This conduct caused—and will continue to cause—Plaintiffs and Class Members to experience distress, aggravation, and annoyance.

118. Upon information and belief, Defendants continue to wrongfully retain the protected personal information of Plaintiffs and Class Members from their motor vehicle records,[5] and Plaintiffs will be further injured by Defendants' future misuse and retention of their illegally obtained personal information.

**F. Common Injuries and Experiences of Plaintiffs and Class Members**

119. Plaintiffs and Class Members were injured when their statutorily protected privacy rights were violated because of Defendants' illegal obtaining, disclosure, and use of their protected personal information, and each Plaintiff was forced to waste time opening and reading the parking invoice letters, and also wasted time attempting to dispute the inflated fees and fines alleged.

120. Plaintiffs seek, on behalf of themselves and each member of the proposed Class, statutory damages under the DPPA in the amount of $2,500 for each defendant's violation, reasonable attorney's fees and other litigation costs reasonably incurred, punitive damages, and

[5] The DPPA requires that certain disclosure records be retained for at least five years. *See* 18 U.S.C. § 2721(c).

such other equitable relief as the court determines appropriate, including injunctive relief in the form of a prohibition on Defendants illegally obtaining, using, and/or disclosing protected personal information obtained from the DMV without a permissible purpose.

***Plaintiff Brian Reider***

121. Plaintiff Reider is a victim of Defendants' scheme. Defendants unlawfully identified him by obtaining his protected personal information from state motor vehicle records without his consent in order to surprise, harass, threaten and intimidate him with bills and fees for parking he never agreed to pay.

122. On or about March 28, 2026, Plaintiff Reiders's daughter went to tour an apartment complex. The apartment complex's parking lot was managed by Premium, but the apartment management assured her that they would validate her parking.

123. MPS's LPR cameras took photos of Mr. Reider's vehicle (driven by his daughter) entering and exiting the parking lot at the apartment complex.

124. A few days later, Defendants MPS and Premium sent a letter asserting a purported parking notice addressed to Plaintiff Reider at his home residence demanding payment of $90.00.[6]

125. Plaintiff Reider spent time retrieving the letter from the mailbox, opening the letter, and reading the letter.

126. The letters threatened that his vehicle would be "subject to booting/towing" if he did not pay.

127. The letter was sent directly from LOB on behalf of MPS and Premium, and instructed Plaintiff to pay online through Premium's website, or by check sent to MPS. The letter also has a MPS emblem on the top corner, meant to resemble an official agency.

---

[6] The internal MPS "Invoice Number" was 14984209.

128. Plaintiff Reider knew he was receiving the ticket in error, so he and his daughter contacted the apartment complex to dispute it.

129. The apartment complex eventually confirmed that the invoice was taken care of and neither Plaintiff Reider nor his daughter owed any money to MPS or Premium.

130. Plaintiff Reider neither provided Defendants with the personal information needed to identify him by name and address nor consented in writing to Premium, MPS, GovCIO, or LOB obtaining and using his motor vehicle records.

131. Plaintiff Reider has never been to the at-issue parking lot and, therefore, obviously did not enter into any contractual agreements with any Defendant related to parking in their lot.

132. Defendants' conduct towards Plaintiff Reider was an intrusion upon his seclusion and an invasion of his privacy, and it caused him to experience emotional distress, aggravation, and annoyance.

133. Defendants harassed and invaded Plaintiff Reider's privacy and solitude by obtaining, disclosing, and using his personal and private motor vehicle record information.

134. Defendants' conduct and DPPA violations caused Plaintiff Reider and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, wasted time, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff Reider and the Class Members.

***Plaintiff Shulamis Rouzaud***

135. Plaintiff Rouzaud is a victim of Defendants' scheme. Defendants unlawfully identified her by obtaining her protected personal information from state motor vehicle records without her consent in order to surprise, harass, threaten and intimidate her with bills and fees for parking she never agreed to pay.

136. On or about August 20, 2025, Plaintiff Rouzaud parked her vehicle at a private parking lot in Chicago, Illinois. She saw signs instructing her to pay to park via the SpotHero app on her phone, so she did so.

137. However, MPS's LPR cameras took photos of Ms. Rouzaud's vehicle entering and exiting the parking lot.

138. A few weeks later, Defendants MPS and Premium sent a letter asserting a purported parking notice addressed to Plaintiff Rouzaud at her home residence demanding payment of $105.12.[7]

139. Not long after, she received a second letter demanding payment of $145.12.

140. She received a third letter again demanding payment of $145.12.

141. Plaintiff Rouzaud spent time retrieving these letters from the mailbox, opening the letters, and reading the letters.

142. The letters threatened that the ticket amount would increase every few weeks and that MPS would refer her to "collections" or tow/boot her vehicle if she did not pay.

143. The letters were sent directly from LOB on behalf of MPS and Premium, and instructed Plaintiff to pay online through Premium's website, or by check sent to MPS. The letters also had a MPS emblem on the top corner, meant to resemble an official agency.

144. Plaintiff Rouzaud believes she received these tickets in error, because the parking lots managed by MPS and SpotHero are located right next to each other.

145. Plaintiff Rouzaud neither provided Defendants with the personal information needed to identify her by name and address nor consented in writing to Premium, MPS, GovCIO, or LOB obtaining and using her motor vehicle records.

[7] The internal MPS "Invoice Number" was 12734661.

146. Defendants' conduct towards Plaintiff Rouzaud was an intrusion upon her seclusion and an invasion of her privacy, and it caused her to experience emotional distress, aggravation, and annoyance.

147. Defendants harassed and invaded Plaintiff Rouzaud's privacy and solitude by obtaining, disclosing, and using her personal and private motor vehicle record information.

148. Defendants' conduct and DPPA violations caused Plaintiff Rouzaud and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, wasted time, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff Rouzaud and the Class Members.

***Plaintiff Timothy Blue***

149. Plaintiff Blue is a victim of Defendants' scheme. Defendants unlawfully identified him by obtaining his protected personal information from state motor vehicle records without his consent in order to surprise, harass, threaten and intimidate him with bills and fees for parking he never agreed to pay.

150. On or about May 18, 2025, Plaintiff Blue's daughter parked the vehicle she was driving at a parking lot managed by Premium.

151. MPS's LPR cameras took photos of Mr. Blue's vehicle (driven by his daughter) entering and exiting the parking lot.

152. A few days later, Defendants MPS and Premium sent a letter asserting a purported parking notice addressed to Plaintiff Blue at his home residence demanding payment of $75.00.[8]

153. Not long after, he received a second letter demanding payment of $90.00.

154. Plaintiff Blue spent time retrieving these letters from the mailbox, opening the

---

[8] The internal MPS "Invoice Number" was 12734661.

letters, and reading the letters.

155. The letters threatened that the ticket amount would increase every few weeks and that MPS would refer him to "collections" or tow/boot his vehicle if he did not pay.

156. The letters were sent directly from LOB on behalf of MPS and Premium, and instructed Plaintiff to pay online through Premium's website, or by check sent to MPS. The letters also had a MPS emblem on the top corner, meant to resemble an official agency.

157. Plaintiff Blue knew he was receiving these tickets in error, so he called to dispute them.

158. MPS confirmed that it sent the tickets to him based on the information gathered from its cameras and, despite his explanation that he never parked in a Premium-managed lot, MPS still refused to void the Invoice.

159. Plaintiff Blue neither provided Defendants with the personal information needed to identify him by name and address nor consented in writing to Premium, MPS, GovCIO, or LOB obtaining and using his motor vehicle records.

160. Defendants' conduct towards Plaintiff Blue was an intrusion upon his seclusion and an invasion of his privacy, and it caused him to experience emotional distress, aggravation, and annoyance.

161. Defendants harassed and invaded Plaintiff Blue's privacy and solitude by obtaining, disclosing, and using his personal and private motor vehicle record information.

162. Defendants' conduct and DPPA violations caused Plaintiff Blue and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, wasted time, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff Blue and the Class Members.

***Plaintiff Michael Collins***

163. Plaintiff Collins is a victim of Defendants' scheme. Defendants unlawfully identified him by obtaining his protected personal information from state motor vehicle records without his consent in order to surprise, harass, threaten and intimidate him with bills and fees for parking he never agreed to pay.

164. On or about November 3, 2023, Mr. Collins was in Destin, Florida and parked in a parking lot managed by Premium believing it was a city-managed parking lot.

165. The city of Destin and private entities both have parking lots along the beach, but the private lots are not well marked.

166. By contrast, the city has numerous signs that inform drivers they do ***not*** have to pay for parking during the off season.

167. MPS's LPR cameras took photos of Mr. Collins's vehicle entering and exiting the parking lot.

168. After mistakenly parking in a Premium lot due to the lack of signage, Mr. Collins received a ticket in the mail from MPS totaling $85.00.[9]

169. The letter threatened that the ticket amount would increase every few weeks and that MPS would refer him to "collections" or tow/boot his vehicle if he did not pay.

170. The letter was sent directly from LOB on behalf of MPS and Premium, and instructed Plaintiff to pay online through Premium's website, or by check sent to MPS. The letters also had a MPS emblem on the top corner, meant to resemble an official agency.

171. Plaintiff Collins believed he received the ticket in error, so he disputed it with Premium.

---

[9] The internal MPS "Invoice Number" was 9919547.

172. Defendant Premium responded to Plaintiff Collins' dispute and claimed the citation was valid.

173. Mr. Collins ultimately paid Premium and MPS in response to the "Parking Invoice."

174. Plaintiff Collins neither provided Defendants with the personal information needed to identify him by name and address nor consented in writing to Premium, MPS, GovCIO, or LOB obtaining and using his motor vehicle records to identify him.

175. Defendants' conduct towards Plaintiff Collins was an intrusion upon his seclusion and an invasion of his privacy, and it caused him to experience emotional distress, aggravation, and annoyance.

176. Defendants harassed and invaded Plaintiff Collins' privacy and solitude by obtaining, disclosing, and using his personal and private motor vehicle record information.

177. Defendants' conduct and DPPA violations caused Plaintiff Collins and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, wasted time, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff Collins and the Class Members.

***Plaintiff David Brewer***

178. Plaintiff Brewer is another victim of Defendants' scheme. Defendants unlawfully identified him by obtaining his protected personal information from state motor vehicle records without his consent in order to surprise, harass, threaten and intimidate him with bills and fees for parking he never agreed to pay.

179. On or about June 12, 2024, a vehicle that looked similar to a truck owned by Plaintiff Brewer parked in a parking garage managed by Premium.

180. MPS's LPR cameras took photos of the aforementioned vehicle entering and exiting the parking lot.

181. Defendants then sent a letter to Plaintiff Brewer at his home residence alleging that Plaintiff Brewer parked in a Premium-managed lot and failed to pay, demanding payment of $115.00. True and correct photos of that letter and the envelope are attached hereto as **Exhibit D**.[10]

182. Plaintiff Brewer then received a second letter demanding a $155.00 payment.

183. Plaintiff Brewer spent time retrieving the letters from the mailbox, opening the letters, and reading the letters.

184. The letters threatened that the Ticket Amount would increase every few weeks and that MPS would refer him to "collections" or tow/boot his vehicle if he did not pay.

185. The letters were sent directly from LOB on behalf of MPS and Premium, and instructed Plaintiff to pay online through Premium's website, or by check sent to MPS. The letters also had a MPS emblem on the top corner, meant to resemble an official agency.

186. Neither Plaintiff Brewer nor his vehicle have ever been to the parking lot where MPS alleged he failed to pay.

187. Despite this fact, Defendants still obtained Plaintiff Brewer's name and mailing address from DMV motor vehicle records and used the information to send him letters.

188. In total, Plaintiff Brewer received three (3) separate letters at his home from Defendants demanding payment.

189. Plaintiff Brewer neither provided Defendant with the personal information needed to identify him by name and address nor consented in writing to Premium, MPS, GovCIO, or LOB obtaining and using his motor vehicle records.

---

[10] The envelopes and letters received by each of the other Plaintiffs and the Class Members are substantially similar to these.

190. Defendants' conduct towards him was an intrusion upon his seclusion and an invasion of his privacy, and it caused him to experience emotional distress, aggravation, and annoyance.

191. Defendants harassed and invaded Plaintiff Brewer's privacy and solitude by obtaining, disclosing, and using Plaintiff Brewer's personal and private motor vehicle record information.

192. Defendants' conduct and DPPA violations caused Plaintiff Brewer and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, wasted time, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff Brewer and the Class Members.

## CLASS ALLEGATIONS

193. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.

194. Plaintiffs seek to represent a class defined as follows:

> All individuals in the United States who had their names and address information obtained from state motor vehicle records and used or disclosed by Defendants (the "Class").

195. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any officer or director of Defendants, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

196. Plaintiffs reserve the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

197. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

198. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiffs believe that the proposed Class includes potentially hundreds of thousands of individuals whose state motor vehicle records were improperly disclosed, obtained, and used by Defendants and their agents. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendants' records.

199. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants GovCIO, MPS, and Premium obtained Plaintiffs' and the Class's protected personal information in violation of the DPPA;

b. Whether Defendants GovCIO, MPS, and Premium made any false representations to obtain Plaintiffs' and the Class's protected personal information in violation of the DPPA;

c. Whether Defendant GovCIO disclosed Plaintiffs' and the Class's protected personal information to Defendant LOB in violation of the DPPA;

d. Whether Defendants GovCIO, MPS, Premium, and LOB used Plaintiffs' and the Class's protected personal information in violation of the DPPA;

e. Whether the thousands of systematic and routine violations of the DPPA by each Defendant were committed willfully and/or with reckless disregard for the law;

f. The nature and extent of all statutory penalties or damages for which Defendants are liable to Plaintiffs and Class;

g. Whether equitable and/or injunctive relief is appropriate; and

h. Whether each Defendants' conduct warrants the imposition of punitive damages.

200. Typicality. Plaintiffs' claims are typical of those of the Class because Plaintiffs—

like all members of the Class—had their protected personal information from motor vehicle records, maintained by a state motor vehicle department, obtained, used, redisclosed and/or resold by Defendants for purposes not permitted by the DPPA. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of Class Members arise from the same operative facts and are based on the same legal theories.

201. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Class and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

202. Superiority. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds or thousands of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

203. The nature of this action and the nature of laws available to Plaintiffs and Class

Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

204. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, uniform methods of data access and collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

205. Adequate notice can be given to Class Members directly using information maintained in the records of Defendants. Defendants have previously sent letters to each of the putative Class Members and still retain the names and addresses of Class Members.

**COUNT I**
**Violations of the Driver's Protection Privacy Act**
**18 U.S.C. § 2721, *et seq*.**

206. Plaintiffs incorporate and reallege the above factual allegations by reference.

207. The Driver's Privacy Protection Act, 18 U.S.C. § 2721(a), *et seq*., prohibits a individual, organization, or entity from knowingly obtaining, disclosing, or using personal information contained in motor vehicle records for any purpose not specifically permitted under 18 U.S.C. § 2721(b).

208. Defendants each violated and continue to violate 18 U.S.C. § 2721, *et seq.*, by knowingly disclosing, obtaining, and/or using the motor vehicle records of Plaintiffs and the Class Members without their express written consent for purposes not permitted under the DPPA.

209. Plaintiffs and Class Members are individuals within the meaning of 18 U.S.C. § 2725(2).

210. The names, addresses, and other information pertaining to Plaintiffs and Class Members that Defendants disclosed, obtained, and/or used was "personal information" as defined under 18 U.S.C. § 2725(3).

211. The contents of Plaintiffs' and Class Members' records disclosed, obtained, and/or used by Defendants constitute "motor vehicle records," because they contain records that "pertain[] to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles," within the meaning of 18 U.S.C. § 2725(1).

212. Defendants GovCIO, MPS, and Premium obtained Plaintiffs' and the Class's protected personal information in violation of the DPPA, because no Defendant had a permissible use for the information.

213. Defendants GovCIO, MPS, and Premium made false representations to obtain Plaintiffs' and the Class's protected personal information in violation of the DPPA.

214. Defendant GovCIO disclosed Plaintiffs' and the Class's protected personal information to Defendant LOB in violation of the DPPA, because LOB had no permissible use for the information.

215. Defendants GovCIO, MPS, Premium, and LOB used Plaintiffs' and the Class's protected personal information in violation of the DPPA by knowingly mailing out threatening

Parking Invoices to Plaintiffs' and Class Members' home addresses, which is not a permissible use under the DPPA.

216. Defendants GovCIO, MPS, Premium, and LOB were not authorized recipients of Plaintiffs' and the Class's protected personal information under 18 U.S.C. § 2721(c).

217. Defendants GovCIO, MPS, Premium, and LOB did not have express written consent from Plaintiffs or Class Members to obtain, disclose, and/or use their protected personal information from state DMV records.

218. As a direct and proximate result of the aforesaid acts and activities of Defendants, Plaintiffs and Class Members have sustained harm including but not limited to, intrusions upon their seclusion, invasions of their privacy, time wasted retrieving, opening, and reviewing Defendants' collection letters, disputing the invoices, and/or remitting payment to Defendants. Plaintiffs and Class Members each experienced emotional distress, aggravation, and annoyance due to the aforesaid acts and activities of Defendants.

219. As provided by 18 U.S.C. § 2724, Plaintiffs and the Class Members seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to comply with DPPA's requirements; (ii) statutory damages of $2,500 for each violation of the DPPA; (iii) punitive damages; and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for relief and judgment, as follows:

a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the Class representatives, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

b. For an order declaring that each Defendants' actions violate the Driver's Privacy Protection Act, 18 U.S.C. § 2721, *et seq.*, as referenced herein;

c. For an award of statutory damages in the amount of $2,500 to each Plaintiff and each member of the Class for each violation of the DPPA by Defendants;

d. Punitive damages against each Defendant, upon proof of willful or reckless disregard of the law;

e. For injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including, *inter alia*: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and, (iv) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

f. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit;

g. For an award of pre-judgment and post-judgment interest as allowed by law; and,

h. For an order granting Plaintiffs and Class Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: June 2, 2026

*/s/ Nathaniel K. Risch*

**MANN & RISCH, LLC**
Nathaniel K. Risch
Fed. Bar No.: 28764
101 E. Chesapeake Ave., Ste. 403
Towson, MD 21286
Telephone: (410) 929-5145
E-Mail: nate@mannrisch.com

Philip L. Fraietta*
**BURSOR & FISHER, P.A.**
50 Main Street, Suite 475
White Plains, NY 10106
Telephone: (914) 874-0708
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

Jonathan S. Mann*
Austin B. Whitten*
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Telephone: (205) 322-8880
E-mail: jonm@pittmandutton.com
E-mail: austinw@pittmandutton.com

Manuel S. Hiraldo*
**HIRALDO P.A.**
401 E. Las Olas Boulevard, Suite 1400
Ft. Lauderdale, FL 33301
Telephone: 954.400.4713
E-mail: mhiraldo@hiraldolaw.com

Rachel Dapeer*
**DAPEER LAW P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: 305-610-5223
E-mail: rachel@dapeer.com

* *pro hac vice* application forthcoming

*Attorneys for Plaintiffs and the Putative Class*